**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**FELIX A. MAURENT,**

   **Petitioner,**

   **v.**

**WARDEN, ROSS
CORRECTIONAL INSTITUTION,**

   **Respondent.**

      **CASE NO. 2:14-CV-2296
      JUDGE GREGORY L. FROST
      Magistrate Judge Elizabeth P. Deavers**

**OPINION AND ORDER**

   Petitioner, a state prisoner, brings the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties.  For the reasons that follow, the Court **DENIES** the Petition for writ of habeas corpus and **DISMISSES** this action.

     **I.**   **FACTS AND PROCEDURAL HISTORY**

   The Ohio Fifth District Court of Appeals summarized the facts and procedural history of the case as follows:

> **The Victim is Embroiled in Litigation with Andrew Levine**
>
> Kevin Davidsen met Andrew Levine in late 2002 or early 2003 through his employment at the time with Johnson & Johnson. Davidsen and Levine became friends and decided to embark upon a real estate venture in which they built high-end homes in desirable vacation destinations. Davidsen and his father provided investment capital and Levine coordinated the contractors and details of the projects.
>
> Davidsen and Levine bought a lot in Crestview, Colorado and built a high-end ski-in, ski-out home. After the home was completed it burned down in a fire that was determined to be arson. Levine was supposed to be working with insurance companies and handling the business details but Davidsen and his father couldn't get any

response from him. Eventually, Davidsen and his father sued Levine. In the course of the lawsuit, they discovered Levine had taken out additional mortgages on the property and received insurance payouts they weren't told about. A sum of $300,000 was held in escrow pending the outcome of the litigation.

**Home Invasion: Victim is Ordered to Drop the Suit**

Davidsen lived with his wife and two young children in a subdivision on Upper Cambridge Way in Genoa Township, Delaware County, Ohio. At the time of these events, Davidsen's wife was nine months pregnant with their third child. On the evening of February 1, 2011, the Davidsens had plans to eat dinner at their neighbors' home a few houses away at 6:00 p.m. The weather was harsh that day; road conditions were snowy and icy, and later that night the power would go out for several hours.

Shortly before 6:00 p.m. Davidsen was not yet home from work [a]nd planned to meet his family at the neighbors' house. As she prepared to leave the house, Mrs. Davidsen went to the front door to turn on the porch light and was surprised when the doorbell rang. She looked outside and saw two men she didn't recognize, but no car or truck in her driveway. This struck her as "bizarre" because of the inclement weather. The men were not dressed appropriately and were wearing light jackets. Mrs. Davidsen described them as possibly Hispanic or light-skinned African–American males; one was taller than the other. Mrs. Davidsen did not answer the door and eventually the two men walked away. She went to an upstairs window and watched them walk down the street until they were out of view.

Mrs. Davidsen proceeded to the garage and put her two children into the car just as her husband arrived home. Together the family went to the neighbors' house for dinner and stayed until about 8:00 p.m. Upon their return home, they watched T.V. for a few minutes before heading upstairs to put their kids to bed. Davidsen and his wife were in separate bedrooms reading to their children when someone rang the doorbell and pounded on their front door.

Davidsen went downstairs while his wife and children remained upstairs. The front porch was illuminated and he could see two Hispanic males outside his front door, facing "sideways" away from the door. Davidsen asked "What do you want?" through the door, and one of the men replied, "We need to talk." Davidsen did not recognize the men and was suspicious: his wife had mentioned

2

the two men from earlier, and now it was 8:45 p.m., dark, snowing, and even worse weather conditions.

One of the two men did all of the talking and the other did not speak. The taller of the two, who seemed to be in charge, told Davidsen they needed to talk about the house next door which was in foreclosure. Davidsen said no, it was too late, and told the men to leave. He also picked up a cordless phone and walked upstairs to the first-level landing where his wife was standing. Davidsen called Dan George, the neighbor he had dinner with, and told him two strange men were at the door and something wasn't right. He asked George if he could come by and make sure everything was all right. George said he would head over. In the meantime, Mrs. Davidsen called 911 on a cell phone.

The men began pounding on the door again. This time, the same one stated, "Let me in. I'm an agent and I need to speak to you." He told Davidsen to come to the window. Davidsen complied and looked out the window; the man flashed some kind of badge that Davidsen didn't see clearly. As the larger of the two men was repeatedly yelling for Davidsen to let him in, Mrs. Davidsen told him not to open the door. Then the man who had not spoken showed Davidsen a gun.

Davidsen decided to open the door, afraid the men might try to shoot through it, believing police and a neighbor were presumably on their way. The larger man still did all the talking, ordering Davidsen to get down on the floor. Davidsen dropped to his hands and knees in the foyer. The two men stood over him, one pointing the gun and the other yelling at Davidsen, "Drop the [expletive] lawsuit. Release the [expletive] money or we'll kill you. You know what this is about." The front door was still open and Davidsen saw Dan George's vehicle pull into his driveway. The intruders then ordered Davidsen further into the house, forcing him into the kitchen.

The larger man again ordered Davidsen to get down on the kitchen floor and continued yelling that if he didn't drop the lawsuit, they would kill him and his entire family. Davidsen heard George honking his car horn in the driveway. The intruders walked out of the kitchen, stepping on Davidsen's hand and puncturing his fingernail as they left. Davidsen remained on the floor for a moment, jumped up, and shut and locked the back door, then ran to the front door and signaled to Dan George that he was O.K. and the intruders were gone. Davidsen ran upstairs to check on his

family, still hiding in a bedroom closet. Mrs. Davidsen was still on the phone with 911 and advised that police were on the way.

Police arrived soon thereafter and checked the entire house and surrounding area. They were unable to locate the intruders that night. Davidsen cooperated fully with the investigation and provided a detailed description of the speaking intruder, resulting in an accurate sketch of the perpetrator, later identified as appellant.

**Victim Returns to Work to Discover More Threats**

Mrs. Davidsen gave birth to the couple's third child on February 10, 2011. Shortly thereafter, Davidsen returned to work after several weeks off due to the home invasion ordeal and the birth of his child. On his work voice mail, he discovered two separate messages that had been left the day after the home invasion. A man stated, "I told you yesterday to release the [expletive] money or I'll hunt you down and I'll hunt your family down. I know where your sister lives in South Boston. I know where your brother lives in the Boston suburbs. I know where your parents live in Arizona." Davidsen recognized the voice as that of the man who threatened him inside his house. The information about his family's whereabouts was also accurate.

**Victim's Sister is Threatened in South Boston**

Gretchen Davidsen is Kevin's sister and lives in a condo in South Boston. On February 9, 2011, her doorbell buzzer rang and a male voice said "Tell your brother to release the money." Gretchen was taken aback and told the person he had the wrong number. The man said, "Tell your brother to do what I said." Gretchen replied, "My brother doesn't live here." The man answered, "I know. He lives in Ohio." Gretchen said she was going to call the police and the man threatened to smash her window. This conversation took place over her condo intercom and her view of the speaker was blocked by an awning. Gretchen was unaware of the home invasion at Kevin's house, but she called him immediately to tell him about the conversation at her condo. Kevin then told her about the home invasion and told her to call the police right away. The Boston police never developed any suspects.

**The Investigation Leads to Appellant's Cell Phone**

The Genoa Township (Ohio) Police Department initially had few leads in the case. Detective Michel Riehle was the lead investigator

and spent the early days of the investigation checking area hotels and rental car agencies with no results. The key to the investigation was the link to Davidsen's business partner, Andrew Levine, whom Riehle knew was based on the East Coast but not in Ohio. In light of the threats that had been made referencing the lawsuit, Riehle asked the F.B.I. to assist in anticipation of out-of-state suspects.

The voice mails left on Davidsen's work phone eventually led to the break in the case. Although the caller had pressed and blocked his number for Caller ID purposes, Riehle was able to subpoena telephone records of the workplace and discover the number that made the two threatening calls: 201–898–1882. By simply performing a Google search on this telephone number, Riehle turned up the website for a private security firm and its president, Felix A. Maurent (appellant). Appellant's photo was prominently featured on the security firm's website and appellant was demonstrated to be the subscriber for this cell number.

Riehle obtained more information on appellant, including his B.M.V. photo from New Jersey. This photo was eventually included in the array shown to Kevin Davidsen, who immediately selected appellant as the intruder who threatened him inside his home on February 1, 2011.

Appellant's cell phone records were also introduced at trial. The State presented text messages on the day of the home invasion between appellant's cell phone and a phone "associated with" Andrew Levine. In the texts, appellant asks "Levine" how old the victim is, where he works, how many people might be in the house, and what the victim's wife's name is. "Levine" urges appellant not to tip the victim off ahead of time, to wait until dark, to "talk to the wife" if he can't get the guy and to urge her to pass it on, and promises him another $2000 if he finishes the job that night. The State also presented an expert in cell phone records analysis who demonstrated for the jury how the cell phone registered to appellant "traveled" on February 1, 2011 from east to west across Pennsylvania, onto I–70, onto the Polaris Parkway, and within a few hundred yards of Kevin Davidsen's residence.

Items found when a search warrant was executed at appellant's apartment in New Jersey tied up remaining loose ends. A cell phone was found with the same serial number as the phone utilized in the records. Appellant was found to have an Australian girlfriend; calls and texts on the phone had been made to Australian numbers. Investigators found "badges" of the type

flashed at Davidsen before the home invasion. Incredibly, in a laundry bag, investigators even found toll receipts dated February 8, 2011 from the George Washington Bridge, Henry Hudson Bridge, and Massachusetts Turnpike—a route which appellant arguably may have used if he had traveled to Gretchen Davidsen's condo in South Boston.

Upon his arrest, appellant eventually admitted he was hired by Andrew Levine to go to Ohio to extort Kevin Davidsen into dropping the lawsuit. Appellant and two accomplices went to Ohio; appellant and an accomplice named "George" went to South Boston to threaten Davidsen's sister. Appellant insisted that in both instances, he stayed in the car while "George" threatened Kevin Davidsen in Ohio and Gretchen Davidsen in Massachusetts.

**Indictment, Suppression, Trial, and Conviction**

Appellant was charged by indictment with one count of aggravated burglary with a firearm specification [R.C. 2911.11(A) (1) ], one count of aggravated burglary with a firearm specification [R.C. 2911.11(A) (2) ], two counts of kidnapping with firearm specifications [R.C. 2905.01(A) (2) ]; two counts of kidnapping with firearm specifications [R.C. 2905.01(A) (3) ]; one count of extortion with a firearm specification [R.C. 2905.11(A) (2) ], and two counts of extortion [R.C. 2905.11(A) (2) ].[2] Appellant entered pleas of not guilty and moved to suppress evidence obtained during his custodial interrogation and as a result of the photo lineup procedure. Two separate suppression hearings were held.

The first hearing focused on the photo lineup. Special Agent Trombitas of the F.B.I. testified that once appellant's B.M.V. photo was obtained from New Jersey, he asked a detective from the Columbus Police Department to use a computer program to put together a photo lineup including appellant's photo. The Columbus detective pulled up ten random photos of persons matching appellant's descriptive characteristics, selected five of those persons for the array, clicked "save," and the computer scrambled the five random photos, along with appellant's, into a "six-pack" array. The Columbus detective then printed the array for Trombitas to show to Kevin Davidsen. The Columbus detective's only involvement in the case was preparing the array; he played no role in showing it to Davidsen. Trombitas was present when the array was presented to Davidsen, who was first advised that the suspect's photo may or may not be included. Trombitas testified as to Davidsen's physical reaction to appellant's photo: he immediately picked appellant and started to "tear up" and "shake

in disbelief ." Trombitas acknowledged the procedural dictates of R.C. 2933.83 were not followed; for example, 10 separate folders were not used, although the guidelines of overall fairness were used.

The second suppression hearing focused on appellant's custodial interrogation. Appellant was arrested in New Jersey on February 1, 2012. He was taken into custody and transported by deputies of the Hudson County (New Jersey) Sheriff's Department. Upon arrival at the Hudson County Sheriff's Department, appellant was brought into the booking area, Mirandized, searched, and placed in a holding cell. About three hours later, a team of officers from the F.B.I., U.S. Marshals, and other agencies questioned appellant without re-Mirandizing him. Appellant told several different versions of events, but ultimately admitted to traveling to Ohio to extort Davidsen at the urging of Andrew Levine. At one point appellant was returned to the holding cell and later brought back for more questioning; at that point, officers asked whether he had been Mirandized in the booking area and he was told that those rights applied to the earlier conversation. Appellant did not invoke his rights and freely spoke with officers.

The trial court overruled appellant's motions to suppress and the case proceeded to jury trial. Appellant was found guilty of the remaining charges and sentenced as follows: Count 1 (aggravated burglary), 8 years plus 3 years for the firearm specification;4 Counts 2 (aggravated burglary) and 3 (kidnapping) merged with Count 1and no sentence was imposed; Count 4 (kidnapping), 3 years; Counts 5 (kidnapping) and 6 (kidnapping) merged with Count 4 and no sentence was imposed; Count 13 (extortion), 24 months; Count 14, extortion, 12 months, and Count 15, extortion, 12 months. The trial court specified the terms as to Counts 4 and 13 are to be served concurrently; the terms as to Counts 14 and 15 are to be served consecutively.

Appellant now appeals from the judgment entries of the trial court overruling his motions to suppress and of his convictions and sentence.

Appellant raises three assignments of error:

ASSIGNMENTS OF ERROR

"I. THE TRIAL COURT ERRED WHEN IT OVERRULED MAURENT'S MOTION TO SUPPRESS."

"II. THE TRIAL COURT ERRED WHEN IT ALLOWED A RECORDING OF A JAIL CALL OVER OBJECTION."

"III. THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE COUNTS I, IV, XIII, XIV, AND XV."

Footnotes

1 Andrew Levine committed suicide before he could be charged in connection with these events.

2 These charges relate to offenses appellant committed against victim Kevin Davidsen. The trial court granted appellant's Crim.R. 29(A) motion for acquittal at the close of appellee's evidence relative to kidnapping counts on behalf of Mrs. Davidsen and the Davidsen children.

. . . .

*State v. Maurent,* No. 12CAA05 0055, 2013 WL 4768866, at *1-6 (Ohio App. 5th Dist. Aug. 23, 2013). On August 23, 2013, the appellate court affirmed the judgment of the trial court. *Id.* On January 22, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Maurent,* 137 Ohio St.3d 1473 (Ohio 2014). On March 26, 2014, the Ohio Supreme Court denied Petitioner's motion for reconsideration. *State v. Maurent*, 138 Ohio St.3d 1452 (Ohio 2014).

On November 18, 2014, Petitioner filed the instant *Petition* pursuant to 28 U.S.C. § 2254. He asserts that the trial court improperly denied his motions to suppress (Claim One); improperly admitted a recording of phone calls he made while incarcerated (Claim Two); and failed to merge the charges against him (Claim Three). It is the position of the Respondent that Petitioner's claims are procedurally defaulted or otherwise fail to provide a basis for relief.

## II.     STANDARD OF REVIEW

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ––– U.S. ––––, ––––, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . .  imposes a highly deferential standard for evaluating state-court rulings, and demands that statecourt decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e) (1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d) (1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d) (2) (a petitioner must show

that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit recently explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d) (1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley,* 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith,* 539 U.S. 510, 520–21, (2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409 and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 562 U.S. at 102 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d) (1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (" '[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on

the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.' " (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*))); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d) (1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under § 2254(d) (1) focuses on what a state court knew and did." *Id.* at 182.

### III.    MERITS

#### A.  Claim One

In Claim One, Petitioner asserts that he was denied a fair trial by admission of his statements to police and the victim's out-of-court identification of him as a perpetrator of the offense over his objections as set forth in his motion to suppress.  The state appellate court rejected this claim as follows:

> [A]ppellant argues the trial court erred in overruling his motion to suppress.
>
> Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist .1998).  During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist. 1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal

standard.  *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

There are three methods of challenging a trial court's ruling on a motion to suppress on appeal.  First, an appellant may challenge the trial court's finding of fact.  In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. *See, State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991).  Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See, Williams, supra.* Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case.  *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist. 1994).

Statements

Appellant first argues the trial court erred in overruling his motion to suppress his statement to police on February 1, 2012 because the statement was made in violation of his Miranda rights. We disagree.

In order for an accused's statement to be admissible at trial, police must have given the accused a Miranda warning if there was a custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of Miranda rights. *Id*. at 476. In this case, appellant was Mirandized during the booking process, placed in a holding cell, and brought into an interrogation approximately three hours later. He was not re-Mirandized prior to that interrogation.

Appellant was Mirandized during his time in custody but not immediately prior to the interrogation; the issue therefore is whether the warnings became "stale."  In *State v. Roberts*, 32 Ohio St.3d 225, 513 N.E.2d 720 (1987), the Ohio Supreme Court applied a totality of the circumstances test and found that warnings

given earlier had gone stale by the time the defendant made incriminating statements:

The following criteria are set forth: " * * * (1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. * * *

*State v. Roberts*, 32 Ohio St.3d 225, 232, 513 N.E.2d 720 (1987), citations omitted.

In this case, the statements were made in the same location, albeit in an interrogation room as opposed to the booking area. Appellant was interrogated by a team of officers from the F.B.I., U .S. Marshals, and Connecticut State Police, not by the New Jersey county sheriff's deputy who Mirandized him upon booking. Appellant thereupon made the first statements he gave to any law enforcement about his involvement in the Davidsen Ohio home invasion, which changed over several iterations.  His demeanor was described as calm and controlled.

Under the totality of the circumstances, we do not find appellant's Miranda warnings were rendered stale within the 3–hour time frame. We note the decision of the U.S. Supreme Court in *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed .2d 1098 (2010), in which the Court found no Miranda violation where the suspect made a statement nearly three hours after receiving his Miranda warning:

"If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his Miranda rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a Miranda warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to re-warn suspects from time to time. Thompkins' answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver."  *Id*. at 2263.

13

Appellant was briefly removed from the interrogation, placed in a cell, then brought back in for further questioning. Upon being returned for questioning, officers asked whether he had been Mirandized upon his arrival at the detention center; appellant stated that he had and that he understood those rights applied to the conversation earlier. As in *Berghuis*, *supra*, we find it relevant that appellant freely answered the officers' questions and at no time invoked his Miranda rights or sought to end the interview.

We find that the trial court did not err in finding that under the totality of the circumstances; appellant's Miranda warnings were neither stale nor insufficient.

Photo Lineup Procedure

Appellant further argues the trial court should have suppressed Davidsen's out-of-court identification of him from the photo lineup and also his subsequent in-court identification. We disagree.

When a witness is shown a photograph of a suspect before trial, due process requires a court to suppress the photo identification of the suspect if the photo array was unnecessarily suggestive of the suspect's guilt and the identification was not reliable. *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), superseded by constitutional amendment on other grounds. The defendant has the burden to show the identification procedure was unduly suggestive. *State v. Harris*, 2nd Dist. Montgomery No. 19796, 2004–Ohio–3570, ¶ 19. If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *Id.*, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist. 1997). If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.*, 120 Ohio App.3d at 325.

The focus under the totality of the circumstances approach is on the reliability of the identification, not the identification procedures. *State v. Jells*, 53 Ohio St.3d 22, 27, 559 N.E.2d 464 (1990), cert. denied (1991), 498 U.S. 1111, 111 S.Ct. 1020, 112 L.Ed.2d 1101.R.C. 2933.83 sets forth the minimum requirements to be followed for a photo lineup procedure.

In this case, the F.B.I. witness acknowledged the procedural strictures of R.C. 2933.83 were not followed; although he is

somewhat familiar with its requirements, at the time of the photo lineup process, it appeared the case would be pursued by federal agencies. Even where the letter of R.C. 2933.83 is not followed, evidence of failure to comply may be taken into account by the trial court in determining a motion to suppress and by the trier of fact in weighing the reliability of the identification resulting from the procedure. The record establishes extensive cross-examination on officers' failure to comply with the statute at the suppression hearing and trial.

In this case, based upon the totality of the circumstances, the photo lineup was not unduly suggestive. We have reviewed the array and disagree with appellant's characterization that appellant's was the only photograph in the array matching Davidsen's given description. Each of the photographs has minor deviations in facial hair, setting of the ears, etc., but collectively the array is not so unduly suggestive as to give rise to a substantial likelihood of irreparable misidentification. The close similarity between appellant's B.M.V. photo and the sketch created from the victim's memory is due to the victim's remarkable recall of appellant's face, evidenced by his physical and emotional reaction upon immediately picking appellant out of the photo array. Davidsen actually wept upon seeing appellant's face again, and the F.B.I. agent who showed him the array testified he's never witnessed such a strong reaction in eyewitness identification. Appellee established the reliability of Davidsen's out-of-court and in-court identifications.

Upon review of the record and the testimony, we do not find the officers failed to comply with the provisions of R.C. 2933.83, nor do we find the procedures utilized were unduly suggestive or created a substantial likelihood of misidentification. Accordingly, we find the trial court properly overruled appellant's motion to suppress the identification. See, State v. Oester, 5th Dist. Stark No.2012CA00118, 2013–Ohio–2676, ¶ 35.

The trial court properly overruled the motions to suppress. Appellant's first assignment of error is overruled.

*State v. Maurent,* 2013 WL 4768866, at *6-9.

### 1. Statements to Police

According to Petitioner, the jail's booking officer read him his rights under *Miranda,* but did not question him regarding the offenses at that time. Approximately three hours later, he

made incriminating statements to police, who did not again advise him of his rights under *Miranda.* Petitioner asserts that he therefore was denied due process by admission of these statements at trial.[1]

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "[B]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* A person being questioned in a custodial interrogation must be warned "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.*

"There is no blanket rule for when police must remind a suspect of his *Miranda* rights, and the mere elapse of time does not necessarily dictate that police give fresh warnings." *United States v. Jones,* 147 F. Supp. 2d 752,  (E.D. Mich. 2001) (citing *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997). "Police are not required to re-warn suspects from time to time." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010). In *Wyrick v. Fields*, 459 U.S. 42, 47-48 1982), the Supreme Court held that police were not required to re-advise the defendant of his rights under *Miranda*, which he had waived in writing before the initiation of a polygraph

---

[1] Petitioner also denies making any incriminating statements to police, and argues that police lied.  Reply (ECF No. 9, PageID# 1193-95.)  The record, however, does not support this allegation.  Petitioner has failed thus to rebut the presumption accorded to the factual findings of the state appellate court.  28 U.S.C. § 2254(e) (1).

examination, because "'the circumstances [had not] changed so seriously that his answers no longer were voluntary' and his waiver was still knowing and intelligent" *Treesh v. Bagley*, 612 F.2d 424, 431 (6th Cir. 2010) (quoting *Fields*, 459 U.S. at 47–48)).  In *Berghuis v. Thompkins*, 560 U.S. at 385, the United States Supreme Court similarly found admissible the defendant's statements made to police approximately three hours being advised of his rights under *Miranda* where the defendant "engaged in a course of conduct indicating waiver" including his failure to invoke his *Miranda* rights, and his response about praying to God for forgiveness.  *Id.*

The Court considers the totality of the circumstances to determine whether police must re-advise a criminal defendant of his rights under *Miranda* prior to initiating additional questioning.  *United States v. White*, 68 F. App'x 535, 538 (6th Cir. 2003) (citing *United States v. Weekley*, 130 F.3d at 750)).  Factors essential to this determination include whether the defendant knew and understood his rights at the time police advised him of his rights, and whether anything happened in the interval between the time of the *Miranda* warnings and the time of his challenged statements that caused him to be unable to fully comprehend the effect of an exercise or waiver of those rights before speaking with police.  *See United States v. Morris,* No. 2:13-cr-000861, 2013 WL 3867836, at *3 (S.D. Ohio July 25, 2013) (citing *United States v. Jones*, 147 F.Supp.2d 752, 761 (E.D. Mich. 2001)).  Other factors include the amount of time that has elapsed between the warning and the statements, whether there were subsequent reminders or re-warnings after the initial reading and waiver, whether the interrogation occurred in the same or a different location than the warning, whether the defendant initiated the interview, and the substance of the *Mirandized* interrogation compared to subsequent interrogations.  *Id.*  (citing *Treesh*, 612 F.3d at 432; *United States v. White*, 68 F. App'x 535, 538

(6th Cir. 2003); *Weekley*, 130 F.3d at 751; *United States v. Square*, 790 F.Supp.2d 626, 653 (N.D. Ohio 2011); *Jones,* 147 F. Supp. 2d at 761–62)).

Police arrested Petitioner on February 1, 2012. (ECF No. 6-4, PageID# 470.) Upon his arrival at the jail, the sheriff read him his *Miranda* rights as part of the booking process. Petitioner indicated that he understood, but refused to sign the *Miranda* waiver form at that time. FBI agents, the U.S. Marshal and state police were present. (PageID# 465. 468-69.) Approximately three hours later, the authorities initiated questioning regarding the charges at issue. At that point, Petitioner made incriminating statements which he now challenges here. (PageID# 488, 492-96.) Police did not again advise Petitioner of his rights under *Miranda* when he began making the statements. (PageID# 490.) Police ended the interview, and returned Petitioner to a holding cell. (PageID# 496.) A few minutes later, police determined that they had additional questions for Petitioner, and had him returned to the interview room. (PageID# 496-97.) Prior to initiating questioning, Petitioner acknowledged that he had been read his *Miranda* rights at booking, and understood that those rights applied to questioning. (PageID# 497.) He was described as "very cooperative." (PageID# 498.) He never requested an attorney or indicated that he did not want to talk. (PageID# 499.)

Petitioner never asserts and nothing in the record suggests that he did not know or understand his rights when police initially provided the *Miranda* warnings or anytime thereafter. The record fails to reflect that anything took place between the time police advised Petitioner of his *Miranda* rights and subsequent questioning, which occurred shortly thereafter, that made him unable to understand the effect of his waiver of those rights. To the contrary, Petitioner acknowledged that he understood his *Miranda* rights applied. Moreover, Petitioner responded freely. Police advised him of his *Miranda* rights and questioned him while he remained

incarcerated at the jail.  Under the totality of the circumstances, this Court therefore concludes that the state appellate court did not unreasonably apply or contravene federal law as determined by the United States Supreme Court in holding that the trial court properly admitted Petitioner's statements to police.

### 2.  Photo Identification

"Over the past fifty years, the Supreme Court has developed a two-part test for determining whether the evidence gathered from an eyewitness identification must be excluded from trial due to the unduly suggestive nature of the identification procedure."  *Howard v. Warden*, 519 F. App'x 360, 366 (6th Cir. 2013).  The Supreme Court

> set forth in *Neil v. Biggers* and reiterated in *Manson v. Brathwaite* the [two-part] approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement." Perry, 132 S.Ct. at 724 (citations omitted).  First, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."  *Ibid.* (emphasis added) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Biggers*, 409 U.S. at 198, 93 S.Ct. 375).  But "[e]ven when the police use such a procedure . . . , suppression of the resulting identification is not the inevitable consequence."  *Ibid*. Rather, the second step of the undue-suggestiveness framework requires an inquiry into "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199, 93 S.Ct. 375. If an identification resulting from an unduly suggestive procedure is nevertheless deemed reliable, it is admissible, "[n]otwithstanding the improper procedure" used by the police. *Perry*, 132 S.Ct. at 725; see also Washam, 468 Fed.Appx. at 570–71 (explaining that "[t]o exclude [eyewitness] identifications, a defendant must show that the identification procedure was unduly suggestive and the identifications were not otherwise reliable").

*Id*.  In making this determination, the Court must consider the following factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the

> time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation. *Ledbetter v. Edwards, supra*, 35 F.3d at 1070, citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers, supra*, 409 U.S. at 199–200.

*Poulsen v. Warden, Ross Corr. Inst*., No. 2:11-cv-1067, 2012 WL 4361433, at *9 (S.D. Ohio Sept. 25, 2012) (citation omitted).

Petitioner contends that the state appellate court erroneously concluded that the photo array used by police was not unduly suggestive. The state appellate court rejected this argument, and Petitioner has not met his burden of establishing by clear and convincing evidence that its factual finding is incorrect. *See Tipton v. Carlton*, 306 F. App'x 213, 219 (6th Cir. 2008) (rejecting the Petitioner's argument that he was entitled to a presumption that the array was unduly suggestive where it had been lost prior to federal review and the state appellate court had already reviewed the photo array and ruled on its suggestiveness well before that time) (citations omitted).[2]

Further, the record reflects that the victim's identification of Petitioner was reliable. He testified that he could "see perfectly" the man who entered his home. (ECF No. 6-6, PageID# 722.) "He was staring at me because he was yelling at me." (PageID# 723.) The area was well lit. (*Id*.) The alleged victim had a good look at the perpetrator "for probably 20 seconds. . . . I remember I was just laying there looking up, just trying to make sure I got a good look." (PageID# 724.) Further, he was able to provide a detailed description which resulted in an

---

[2] The photo array has been made a part of the record before this Court (ECF No. 6-1, PageID# 145), but is somewhat difficult to decipher. Nevertheless, as set forth above, Petitioner has not rebutted the presumption of correctness as to the state appellate court's determination, after its independent review, that the photo array was not unduly suggestive.

accurate sketch of the Petitioner.  A few months later, when shown the photo array, he immediately identified Petitioner.  He was certain of his identification.  He exhibited signs of this certainty by weeping and shaking in disbelief.  Police indicated that they had never witnesses such a strong reaction to any eye witness identification.  (PageID# 747.)

Claim One therefore fails to warrant federal habeas corpus relief.

B. **Claim Two**

In Claim Two, Petitioner asserts that the trial court improperly admitted a recording of his jail phone conversation.  The state appellate court rejected this claim as follows:

> [A]ppellant argues the trial court erred in admitting the recording of a telephone call made by appellant while incarcerated. We disagree.
>
> The admission or exclusion of evidence is a matter left to the sound discretion of the trial court. Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). To be admissible, a tape recording must be authentic, accurate, and trustworthy. *State v. Were*, 118 Ohio St.3d 448, 2008–Ohio–2762, 890 N.E.2d 263, ¶ 109, citing *State v. Rogan*, 94 Ohio App.3d 140, 148, 640 N.E.2d 535 (1994).
>
> In this case, appellee sought to introduce evidence in the form of a CD of a telephone call made by appellant while he was incarcerated in the Hudson County, New Jersey jail. The CD was introduced by the State during the testimony of Detective Riehle of the Genoa Township (Ohio) Police Department. As context, Riehle testified he subpoenaed all jail calls made by appellant during his time in custody at the Hudson County jail. The CD of all of appellant's calls was accompanied by a "notarized letter" from a lieutenant of the Hudson County Jail certifying that the calls on the CD are true and accurate copies of calls made by appellant, downloaded and transferred onto the CD in New Jersey. Riehle testified that he listened to all of the calls, listening for any reference to the case, and that it is appellant's voice on the calls.
>
> Riehle then made his own CD as a trial exhibit of a portion of one of these calls, in which appellant is speaking to an unidentified

woman and uses the phrase "as soon as possible. . . ." Appellee's purpose in admitting the call was not the content of the conversation but so that the trier of fact could compare appellant's (known) voice on the jail call with the threatening messages left on the victim's voice mail.

Appellant objected before the recording was played for the jury on the basis that the recording was not properly authenticated. The trial court overruled the objection, agreeing with the State that the CD recording of the call, as accompanied by the notarized letter, is "self-authenticating." We find no authority in support of the argument that the recording is "self-authenticating," however, we find the trial court did not abuse its discretion in admitting it. In *State v. Tyler*, the Fourth District reviewed the requirements for admission of a recording such as this one, and found the threshold of admission to be "quite low:"

Evid. R. 901 governs the authentication of demonstrative evidence such as recordings of telephone conversations. The threshold for admission is quite low, as the proponent need only submit "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Evid.R. 901(A). This means that "the proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be."  *State v. Payton* (Jan. 25, 2002), Ross App. No. 01 CA2606, 2002 WL 184922, at *3, citing *State v. Isley* (June 26, 1996), Summit App. No. 17485, 1996 WL 351154, citing *State v. Caldwell* (Dec. 4, 1991), Summit App. No. 14720, 1991 WL 259529. A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence. State v. Williams (1979), 64 Ohio App.2d 271, 274, 413 N.E.2d 1212.

To be admissible, a sound recording of a telephone call must be "authentic, accurate, and trustworthy." *State v. Were*, 118 Ohio St.3d 448, 2008–Ohio–2762, 890 N.E.2d 263, at ¶ 109, citing State v. Rogan (1994), 94 Ohio App.3d 140, 148, 640 N.E.2d 535. Evid.R. 901 provides for two theories upon which a trial court might admit a sound recording. Giannelli, * *18 Evidence (3d Ed. 2010) 409, Section 901.19. First, Evid.R. 901(B)(5) provides for authentication by voice identification "whether heard firsthand or through mechanical or electronic transmission or recording." Second, under Evid.R. 901(B)(9), a sound recording may be authenticated through evidence that demonstrates a process or system used that produces an "accurate result."

*State v. Tyler*, 196 Ohio App.3d 443, 2011–Ohio–3937, 964 N.E .2d 12 (4th Dist.), ¶ 25–26.

In this case, we find the foundational evidence was sufficient for the trial court to allow the State to introduce the recording of the call. Riehle testified he listened to the original calls, created the recording of the call, and he recognized appellant's voice on the jail call.

We note appellant also raises a Confrontation Clause argument in this assignment of error relative to the notarized letter from the New Jersey Deputy Sheriff, which is neither testimonial in nature nor hearsay. "To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay." *State v. Smith*, 5th Dist. Guernsey No.2012–CA–17, 2013–Ohio–1226, ¶ 24, citing *United States v. Deitz*, 577 F.3d 672, 683 (6th Cir. 2009).

Finally, even if we were to find admission of the recording was in error, such error would be harmless because of the overwhelming evidence of appellant's guilt.   Harmless errors are to be disregarded and the erroneous admission or exclusion of evidence is not reversible unless it affects a substantial right that prejudices the defendant. See, Crim. R. 52(A); Evid.R. 103(A); *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

*State v. Maurent*, 2013 WL 4768866, at *9-11.

To the extent that Petitioner raises a claim regarding the alleged violation of state evidentiary rules, this claim fails.  As a general matter, errors of state law, especially the improper admission of evidence, do not support relief under habeas corpus.  *See Estelle v. McGuire*, 502 U.S. 62, 112 (1991); *see also Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006). The Court "must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition."  *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (internal quotation omitted). To be entitled to habeas relief, a petitioner must demonstrate that an evidentiary ruling violated more than a state rule of evidence or procedure.  In order to prevail, a petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of

fundamental fairness." *Giles,* 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)). Stated differently, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006) (citing *Roe v. Baker,* 316 F.3d 557, 567 (6th Cir. 2002)). A state court evidentiary ruling does not violate due process unless it "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Gile*s, 449 F.3d at 704 (citing *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001)). Such are not the  circumstances here. Petitioner has failed to show that the state court evidentiary ruling was egregious or that it resulted in fundamental unfairness.

Petitioner nevertheless also asserts that his conviction violates the Confrontation Clause. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross examine adverse witnesses at all stages of the trial. *Illinois v. Allen*, 397 U.S. 337, 388 (1970). In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court abrogated its holding in *Ohio v. Roberts*, 448 U.S. 56 (1980), and re-defined the test for determining whether admission of hearsay statements violates the Confrontation Clause. The Supreme Court in *Crawford* held that testimonial statements of a witness who does not appear at trial are inadmissible unless the witness was unavailable to testify and the defense had a prior opportunity to cross examine the witness. Under *Crawford*, "[w]here testimonial evidence is at issue . . .  the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination." *Id*. at 1366. The Supreme Court, however, left untouched application of *Roberts* to cases involving nontestimonial hearsay:

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does Roberts, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. As the courts applying *Crawford* have observed,

> [t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . .

> [U]nless a particular hearsay statement qualifies as "testimonial," Crawford is inapplicable and Roberts still controls.

*Coy v. Renico*, 414 F.Supp.2d 744, 773 (E.D. Mich. 2006) (quoting *United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005)); *Horton v. Allen*, 370 F.3d 75, 83–84 (1st Cir. 2004).

The Supreme Court declined to define a comprehensive definition of the term "testimonial," but indicated, at a minimum, the term includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68. A casual remark to an acquaintance, business records, and statements made in furtherance of a conspiracy do not constitute testimonial statements within the protection of the Sixth Amendment. *Id*. at 51–55.

To determine whether a statement is testimonial, the Court "must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Bullcoming*, 131 S.Ct. 2720 (Sotomayor, J. concurring) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). Under the "primary purpose" test, statements "are testimonial when the circumstances objectively indicate" that their primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *Ohio v. Clark*, ---  U.S. ---, --, 135 S.Ct. 2173, 2179-80

(2015) (citing *Harmon v. Indiana*, 547 U.S. 813, 822 (2006)).   In making this inquiry, the Court must consider all relevant circumstances.   *Id*. at 2180.   "[T]he primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause."   *Id*. at 2180-81.   "[I]n the Confrontation Clause context, business and public records 'are generally admissible absent confrontation . . .  because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.' "   *Bullcoming*, 131 S.Ct. at 2720 (Sotomayor, J. concurring) (citing *Melendez-Diaz,* 557 U.S. at 322-23)).

In the Sixth Circuit, the test for determining whether a statement is deemed testimonial within the meaning of *Crawford* is:

> . . .  whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

Petitioner complains, specifically, that the trial court improperly admitted a notarized letter from the sheriff certifying that calls downloaded and transferred onto a CD were a true and accurate copy of Petitioner's recorded calls from jail.   The state appellate court held that the notarized letter did not constitute testimonial evidence within the meaning of *Crawford*.   The letter arguably constitutes a business record which, as set forth above, is generally admissible without confrontation.   Its primary purpose was not to create an out-of-court substitute for trial testimony, but to verify that the recordings were authenticate as obtained from the jail in which Petitioner made calls while incarcerated.   Further, Davidsen identified Petitioner as the gunman and identified Petitioner's voice as the "exact voice" of the man who entered his home.   (ECF

No. 6-6, PageID# 742.)  Davidsen was "100 percent" sure that it was the voice of the same man. (*Id.*)  The sole purpose for admission of the phone recording was so that the jury could compare it to the voice leaving threatening messages on the alleged victim's voice mail.  As such, admission of the jail phone recordings constituted cumulative evidence to Davidsen's testimony.

Claim Two fails to provide a basis for relief.

## C.  Claim Three

In Claim Three, Petitioner asserts that the trial court improperly failed to merge his convictions on aggravated burglary, kidnapping, and extortion, as charged in Counts 1, 4, and 13, and his charges on two counts of extortion, as charged in Counts 13 and 14.  Petitioner argues that these charges resulted from the same act of entering the Davidsen's home and delivering a threatening message, and from phone calls left on Davidsen's work voice mail delivered only seven minutes apart.  The state appellate court denied the claim as follows:

> [A]ppellant argues the trial court erred in failing to merge some of his convicted offenses for sentencing.  We disagree.
>
> R.C. 2941.25 states as follows:
>
> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
>
> In *State v. Johnson*, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. 128 Ohio St.3d 1405, 2010–Ohio–6314. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the

other with the same conduct. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge according to Johnson, supra.

Appellant was indicted upon, convicted of, and sentenced upon one count of aggravated burglary pursuant to R.C. 2911.11(A) (1), one count of kidnapping pursuant to 2905.01(A) (2), and one count of extortion pursuant to R.C. 2905.11(A) (2) for the February 1, 2011 home invasion. Appellant argues the trial court committed plain error when it failed to merge these offenses for purposes of sentencing.

Appellant forced his way into Davidsen's home, held him under threat of use of a firearm, and threatened to kill him and his family if he didn't drop the Levine suit. We disagree with appellant's characterization of these events as a single act of "delivering a message." Appellant's actions constituted both separate conduct and separate animus under these circumstances. Id. Appellant was properly convicted of and sentenced upon three separate offenses.

Appellant further argues that the final two extortion counts should merge. Counts 13 and 14 represent the two threatening messages left on Davidsen's voice mail at work, minutes apart. These voice mails are in the record as State's Exhibit 9 and we have reviewed them. We decline to merge these offenses together or with any other offenses. In the first message, appellant states, e.g., he's not playing games, and as he told Kevin Davidsen at his house, he will come after his mother and father in Arizona, his sister in South Boston, and his brother in the Boston suburbs if he doesn't "drop the allegations." In the second message, appellant states, e.g., "for the last time, I will come back up there and kill you and your entire [expletive] family including . . .  your brother and his children in Boston; this is what I do for a living; these are your orders; I'm coming back for you." Temporal proximity does not equate to a single continuous incident in this case; appellant reiterated his threat and intensified it, mentioning even his brother's children to get Davidsen's attention.

We find each of these offenses was committed with separate conduct and a separate animus, and the trial court properly

> declined to merge the offenses for sentencing. Appellant's third
> assignment of error is overruled.

*State v. Maurent*, 2013 WL 4768866, at *11-12.

Respondent contends that Petitioner presented this claim to the state courts only as a matter regarding the alleged violation of state law, and that it therefore fails to provide a basis for relief. The record, however, reflects that Petitioner presented the claim to the state courts as both one under the Double Jeopardy Clause and as a violation of Ohio's statutes on allied offenses of similar import. (ECF No. 6-1, PageID# 207-08.)

This Court has previously held that, even when a state appellate court rejects a Petitioner's claim involving an alleged violation of Ohio's statutes on allied offenses of similar import without specifically referring to federal law addressing the constitutional prohibitions set forth under the Double Jeopardy Clause, Ohio law derives from the same concerns as that of the Double Jeopardy Clause and therefore raises a federal issue appropriate for review in these *Jones v. Warden*, No. 2:12-cv-150, 2013 WL 6181468, at *7 (S.D. Ohio Nov. 26, 2013) (citing *Cody v. Jeffreys*, No. 2: 10–cv–974, 2013 WL 170268 at *4–*5 (S.D. Ohio Jan.16, 2013) (citing *Palmer v. Haviland*, No. C–1–04–28, 2006 WL 1308219 (S.D. Ohio May 11, 2006); *Spence v. Sheets*, 675 F. Supp.2d 792 (S.D. Ohio 2009); *Helton v.Jeffreys*, No.2:06–cv–558, 2007 WL 1100428, at *4–*5 (S.D. Ohio April 10, 2007). Thus, the state court's decision rejecting Petitioner's claim, though couched in terms of state law, is entitled to deference under the AEDPA. As such, the Court will address the issue here.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause has been interpreted as protecting criminal defendants from successive prosecutions for the same offense

after acquittal or conviction, as well as from multiple punishments for the same offense.  *Brown v. Ohio*, 432 U.S. 161, 165 (1977). The traditional test for double jeopardy claims is the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (requiring the court to determine whether each charged offense "requires proof of an additional fact which the other does not"). The *Blockburger* test is designed to deal with the situation where closely connected conduct results in multiple charges under separate statutes. Under *Blockburger,* the critical question is whether the multiple charges in reality constitute the same offense. Thus, the *Blockburger* test focuses on whether the statutory elements of the two crimes charged are duplicative. If the elements of the two statutes are substantially the same, then double jeopardy is violated by charging the defendant under both.

Because the state appellate court did not address the federal constitutional claim, this Court must consider the applicable standard of review.

> There are three options: the deferential standard provided under § 2254(d); the *de novo* standard, and the "intermediate approach." *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (de novo); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), cert. denied, 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001) (discussing alternate standards); *McKenzie v. Smith*, 326 F.3d 721, 726–27 (6th Cir. 2003), cert. denied, 540 U.S. 1158, 124 S.Ct. 1145, 157 L.Ed.2d 1057 (2004) (same); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005) (same). The gist of circuit precedent is that when there is a decision, deference is accorded under § 2254(d) to the state court decision under the "intermediate approach." *Moldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005); *Howard*, 405 F.3d at 467. When there is no decision or "no results," federal review is *de novo. See Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (*de novo* when there was no state court decision on second prong of Strickland test). When the state court has failed to articulate a decision or provide a rationale, the district court must distinguish between a situation of "no results" from that of "no reasoning".  *Howard v. Bouchard*, 405 F.3d at 467; *McKenzie*, 326 F.3d at 727 . . . .  [T]he "no reasoning" situation occurs when the state court has issued a summary order, which fails to explain its reasoning, as opposed to the situation where no state court has

30

"directly addressed the specific issue." In the latter situation there are "no results" for the federal court to defer, and de novo review by the federal court is required.  *See Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; McKenzie, 326 F.3d at 327.

*Socha v. Wilson*, 477 F. Supp. 2d 809 (N.D. Ohio Feb. 21, 2007).  Under either the "intermediate approach" or a more deferential standard of review, Petitioner's double jeopardy claim fails.

The Indictment charged Petitioner in Count 1 with trespassing in an occupied structure on February 1, 2011, with the purpose to commit therein any criminal offense, and inflicting or attempting or threatening to inflict physical harm, in violation of O.R.C. § 2911.11(A) (1), with a firearm specification.  (ECF No. 6-1, PageID# 84.).  The Indictment charged Petitioner in Count 4 with, in conjunction with one or more persons on February 1, 2011, by force, threat or deception, purposely removing Kevin Davidsen from the place where he was found or restraining him with the purpose to terrorize or inflict serious physical harm on Davidsen or another, in violation of O.R.C. § 2905.01(A) (3), with a firearm specification.  (ECF No. 6-1, PageID# 86.)  The Indictment charged Petitioner in Count 13, in conjunction with one or more persons, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, threatening to commit any offense of violence, in violation of O.R.C. § 2905.11(A) (2) on February 1, 2011 with a firearm specification.  (ECF No. 6-1, PageID# 92.) The Indictment in Count 14 charged the same criminal acts as in Count 13, but alleged that they took place on February 2, 2013.  (ECF No. 6-1, PageID# 93.)

The record indicates that the perpetrators forced their way into Davidsen's home at gunpoint and ordered him onto the ground on the foyer in front of the door whereupon they threatened to kill him if he did not drop the lawsuit.  (ECF No. 6-6, PageID# 705-10.)  They then ordered him to get up and move into the kitchen, where they again ordered him onto the floor, and threatened to kill his whole family if he did not drop the lawsuit.  (PageID# 717-19.)  Prior

to exiting the house, the gunman again threatened to come back and kill Davidsen and his entire family if he did not drop the lawsuit.  (PageID# 721.)  When Davidsen returned to work, he found two threatening messages on his voicemail threatening to kill him and his family, including his sister and brother in Boston, and his parents in Arizona.  (PageID# 740-42.)  The first call was placed on February 2, 2011, at approximately 11:09 a.m., and the second call was placed at 11:16 a.m.  (ECF No. 6-8, PageID# 2019.)  .

Thus, the facts reflect that Petitioner placed two threatening phone calls to Davidsen.  He removed and restrained Davidsen inside of Davidsen's home in order to terrorize or threaten his life if he did not drop the lawsuit.  Upon exiting the house, he again threatened Davidsen and his family with physical harm if he did not drop the lawsuit.  The state appellate court did not contravene or unreasonably apply federal law, as determined by the Supreme Court, or base its decision on an unreasonable determination of the facts in light of the evidence presented in concluding that these actions constituted separate acts and therefore did not violate the Double Jeopardy Clause.

Claim Three fails to provide a basis for relief**.**

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Petition for writ of habeas corpus (ECF No. 1) and **DISMISSES** this action.

**IT IS SO ORDERED.**

     /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE